Olga Lydia **PAZ**, Plaintiff,

v.

Fred E. **WEIR**, Cheryl Archer, Jail Chaplaincy Ministry & Harris County, Texas, Defendants.

No. CIV. A. H–99–1645.

United States District Court, S.D. Texas.

April 6, 2001.

John Mark Somyak, John Somyak and Associates, Sean K. McPherson, John Somyak & Associates, Houston, TX, for Plaintiff.

Elizabeth Trevino, EEOC, Houston District Office, Bettina J. Richardson, Robin Burt Springer, Springer and Associates, Frank Sanders, Harris County Attorney's Office, Houston, TX, for Defendants.

Karen Kay Kristopher, Houston, TX, Pro se.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Harris County, Texas's ("the County") Motion for Summary Judgment (# 55). The County seeks summary judgment on Plaintiff Olga Lydia Paz's ("Paz") claims brought under 42 U.S.C. §§ 1983, 1985, and 1986, as well as a state law claim for sexual battery. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment should be granted in part and denied in part.

### I. *Background*

In the summer of 1997, Paz was incarcerated in the Harris County Jail ("the Jail"), which falls within the purview of the Harris County Sheriff's Department ("Sheriff's Department"). Pursuant to Texas law, the Jail provides a ministry to inmates seeking religious services and spiritual counseling. The Jail contracted with Jail Chaplaincy Ministries, Inc. ("Ministries") to provide such services. Defendant Fred E. Weir ("Weir") was both the President of the Ministries and a working chaplain at the Jail during Paz's 1997 and 1998 confinements. He is currently the Executive Director of the Ministries. In addition to his religious duties, Weir also served as the head of the Jail's library.

Paz alleges that on several occasions during her incarceration, she had various types of sexual contact with Weir. According to an affidavit Paz signed in 1998:

Last year, 1997 on May 5 in cell 12 a–1 I had a spiritual awakening and I

know that I that I know that [sic] there is a "God." I was approached by Chaplain Archer in June of 1997 to be a trustee for her. I started working for her in her office. Shortly after I started working for Chaplain Archer I met Chaplain Weir the head Chaplain for Harris County Jail.

I have a gift that the Lord blessed me with. I can draw anything I see. Chaplain Weir bought me close to $100.00 worth of art supplies.

He asked to talk to me in his office one day and he told [sic] me if I was doing alright, how I was feeling and told me that I was a special child in the eyes of "God." He also told me and showed me in the bible where we are forgiven for all our sins that we have committed and the sins we will commit because Jesus Christ died for us so we could go directly to "God" and ask for forgiveness. And than [sic] he told me that we were under grace because of Jesus Christ. He told me I was a very special person and a very beautiful woman.

&ast; &ast; &ast; &ast; &ast; &ast;

The first incident occurred in Chaplain Weir's office on the third floor of the 1301 Jail. I have already described this incident in the first statement of this document. I had asked Chaplain Archer to take me to speak to Chaplain Weir for spiritual counseling and she took me to Chaplain Weir's office in the early afternoon of early July, 1997. Once I was in Chaplain Weir's office, he commenced telling me how special and pretty I was. I could tell immediately that he was coming on to me. I can tell when a man is coming on to me because I have been prostituting for years and can read men. Chaplain Weir asked me if he could do for me financially and I told him my son's birthday was approaching and I would like to get him something. As we talked, Chaplain

Weir came around his desk and sat on the edge of the desk facing me as I sat in a chair. He then put his hands under my jail shirt and he fondled my breasts for a few minutes. I knew what he was going to do, I could see it coming, and I didn't object, so I let him fondle me. Chaplain Archer was right outside Chaplain Weir's office at this time. After only a few minutes, the meeting ended and I returned to Chaplain Archer's office where I was an inmate worker.

Some days later, maybe a week or two, I was working alone in Chaplain Archer's office on the 11th floor of the 1301 Jail. Sometime after Chaplain Archer went home, Chaplain Weir came into the office. This was sometime between 4:00 p.m. and 6:00 p.m. He came straight to me and put his hands under my shirt again and began fondling my breasts again. The fondling occupied about two or three minutes. I remembered that Chaplain Pettiway [sic] was still on the floor, ministering. I told Chaplain Weir this and he stopped fondling me. About two minutes after Chaplain Weir stopped fondling me Chaplain Pettiway [sic] entered the office. She saw me and Chaplain Weir there, talking. I did not tell Chaplain Pettiway [sic] about the fondling because I was then very confused by what Chaplain Weir had done to me. I had looked to him for the spiritual help I needed and he took advantage of my confusion and vulnerable position. Chaplains Weir and Pettiway [sic] then left the office and I remained for the balance of my work shift.

The third incident occurred about the first week of August. I was working alone in the trustee work area of Chaplain Archer's office on the 11th floor again. Sometime between 4:00 p.m. and 6:00 p.m. Chaplain Weir entered the office, came straight to me in the trustee

work area (This area is separated from the rest of the office by a partition) and kissed me on the mouth and neck. He then put his hand in my pants and inserted his fingers into my vagina. This lasted for a couple of minutes while he talked about dildos and stated he wanted to use one on me and see my reaction while I had an orgasm. He also said he was looking forward to spending a lot time with me and buying me lacy undergarments. He also told me he would buy my son some birthday presents and told me to get him a list of what presents I wanted for them [sic]. After a couple of minutes he stopped fondling me and made small talk, and then left the office.

After this third incident, I was working in Chaplain Archer's office one day when I saw Chaplain Weir on the floor. I asked to talk to him and gave him some newspaper ads that I had cut out showing the gifts I wanted for my son's birthday. He took the ads and said "OK, that's fine" and left.

About August 20 or 21, I was again working in Chaplain Archer's office. Sometime after 4:00 p.m., Chaplain Cantu told me that Chaplain Weir wanted to see me and then she escorted me to Chaplain Weir's office on the third floor. I entered Chaplain Weir's office and Chaplain Weir shut the door. Chaplain Cantu remained outside. Chaplain Weir told me he had purchased the presents I wanted and I saw a bluish trunk on a dolly. This trunk was one of the cutout ads I had given Chaplain Weir earlier. He told me the other gifts I wanted were inside and I opened the trunk. Inside were an insulated blue lunch box, a gray Dallas Cowboys pullover shirt, a musical Mickey Mouse watch, a pair of gray and blue hiking boots, and some candy. Chaplain Weir had bought tape and wrapping paper and a birthday card, so I wrapped the gifts and signed

the card. Chaplain Weir told me he would deliver the gifts to my son the next day. While I was kneeling on the floor wrapping the gifts, Chaplain Weir was behind me with one hand in my pants and his fingers inserted into my vagina. This continued for about twenty minutes while I wrapped the gifts. When I was finished wrapping the gifts, Chaplain Weir extracted his hand, kissed me and told me he would be sure to deliver the gifts the next day. Chaplain Weir then opened the door and I returned to my cell.

About the week of September [sic], I again was working in Chaplain Archer's office on the 11th floor. Between 4:00 p.m. and 6:00 p.m. Chaplain Weir phoned this office and I answered. I believe another Chaplain was in the office when Chaplain Weir phoned, but I cannot recall who. Chaplain Weir asked me if anyone was in the office with me and I, speaking cautiously so the Chaplain present would not understand, told him it would be alright for him to come up in about ten minutes (because the Chaplain present was in the process of leaving). About ten minutes later Chaplain Weir entered the office, came straight to me, and kissed me. He grabbed my pants and I helped him lower my jail pants and underpants to about mid-thigh. My hips, pubic area, and upper thighs were fully exposed. Chaplain Weir got on his knees and began licking my pubic area and inserting his fingers in to my vagina. One hand was fondling my breasts. I think this occupied about fifteen minutes. I became nervous that someone might enter the office and discover us. Chaplain Weir finished, then went to the water fountain and washed his mouth and hands. He talked about how he wanted to see me when I got out of jail and how he was going to financially help me on

the outside. He then kissed me and left. I remained in the office and finished my work shift. I was very upset by Chaplain Weir's repeated contacts with me.

According to Paz, she reported these incidents to Chaplain Lynne Johnson ("Johnson"), who advised her to report them to Chaplain Cheryl Archer ("Archer"). Paz claims that she told Archer that Weir "had been fondling [her] and doing other sexual things to [her]." Archer replied, "OK, that's enough," and then prayed with Paz and Johnson. Archer and Johnson then went to Weir's office to confront him about the allegations. When they returned, Archer told Paz that Weir had broken down and cried. Archer informed Paz that Weir was no longer allowed to minister to females and was not permitted to come to her office where Paz worked.[1] Archer also imparted to Paz that she had "gone to 'someone in high office' to watch Chaplain Weir." Paz claims that about two days later, she met with Archer and Weir, at which time Weir apologized to her in general terms. With the passage of time, Paz became more upset and approached Archer, who directed her "to quit being judgmental, because 'we pleaded [sic] the blood of Jesus over it' and if [she] didn't have any forgiveness, how was [she] supposed to expect the Lord to forgive [her]?" Archer then commented that Paz "had a lot of imperfections and had a Jezebel spirit, and that [she] needed to work on [herself] and let the matter go." Paz apparently developed a poor attitude toward fellow inmates and staff, causing her "band" to be broken by Archer, meaning she was no longer classified to work in the Ministries' office. Paz was placed in protective custody for eight days in December 1997 and released from the Jail on December 18, 1997.

As a result of another arrest, Paz returned to the Jail on May 16, 1998.[2] Two days later, Paz was placed in administrative separation after she was accused of creating a disturbance in Chaplain Archer's office. The record indicates that on June 8, 1998, she was found not guilty of the disciplinary infraction, but she remained in administrative separation until July 1, 1998. Paz claims that she was initially placed and then maintained in administrative separation, where she was segregated from the general inmate population, because the County was concerned that she would speak out against Weir and the Ministries. Paz stated at deposition that, while in administrative separation, she mentioned her contacts with Weir to a Jail employee who was working in the commissary. It is undisputed that after Paz's release from administrative separation, she reported Weir's activities of 1997 to two Sheriff's deputies, who instructed her to reduce her accusations to writing. After she submitted a written complaint, an investigation of the allegations by the Sheriff Department's Internal Affairs Division ensued. The investigation was conducted by Detective Pete Lampson ("Lampson").

As part of the investigation, Lampson interviewed Weir, who denied both sexually touching Paz and talking to her about sexual matters. Weir told Lampson: "When Inmate Paz entered my office, the door remained open and other people were in the area. Inmate Paz wrapped the gifts

---

1. It is undisputed that the Ministries' Operational Procedures Manual states: "Without exceptions, male volunteers will minister to male inmates and female to female. There will be no male to female or female to male ministry."

2. As of September 4, 1998, Paz's criminal history included five felony convictions, three for possession of a controlled substance, one for theft, and one for forgery. Additionally, she had several misdemeanor convictions, including making a false report to a police officer, assault, and criminal mischief.

and left.[3] I did not fondle her and could not without being seen by others in the area." According to Weir, there was only one occasion on which he and inmate Paz were alone in his office, with his door closed, for ten to fifteen minutes, while Chaplain Archer and others were immediately outside his door. Weir advised Lampson that he apologized to Paz because he felt "like [he] must have done something to cause her to believe the things she said about [him]." Weir testified at deposition that he told Paz:

> If I ever touched you, brushed against you, said anything to you or caused you to think in any—for any reason that I have any ulterior motives, I apologize to you, and I will assure you that nothing like that will ever happen again, meaning that I would never from that day forward be in a spot where I was alone with her again.

Both Paz and Weir were given polygraph examinations regarding the events that transpired in the summer of 1997. Paz's polygraph test result indicated that she was "Strongly NDI [No Deception Indicated]," while Weir's indicated that deception was "strongly indicated."

Archer gave three sworn statements to Lampson regarding the incident. Archer verified that Paz told her that Weir had "touched her in places and put his hands in her clothing." Archer related to Lampson that she was under the impression that there was only one incident between Paz and Weir, but she admitted that "it is written policy for male Chaplains not to have contact with female inmates, including Chaplain Weir." Archer requested Paz to submit a written report, but Paz declined to do so. Archer met with Weir to discuss the incident and the danger of chaplains ministering to inmates of the opposite sex. Archer later stated that she was "torn between what had allegedly happened [and her] duty to [Paz] as Chaplain and [her] position on Chaplain Weir's staff." Archer, who was present during Weir's apology to Paz, told Lampson that although Paz "voiced her acceptance of [Weir's] apology and forgave him[,] Paz's body language [indicated] she still thought . . . the incident did occur." Archer reported that she and Johnson once again met with Weir, who denied the allegations but also "broke down and cried." Weir told Archer that he would handle the situation and report Paz's accusations to the Sheriff's administration. He had instructed Archer "not to report matters to the Sheriff's Department administration without first reporting to him." Archer denied that she was ever outside Weir's office when Paz was inside behind a closed door. Archer further stated that Paz repeatedly brought up the allegations and seemed to have a "lingering hurt over the incident." She believed, however, that Paz was using the incident to gain "leverage and sympathy." Consequently, Archer told Paz to stop using the allegations to "threaten and manipulate."

Lampson also spoke with Johnson, who reported that "Paz described instances of touching, hugging, kissing and sitting on Chaplain Wier's [sic] lap and stated that Chaplain Wier [sic] had touched [Paz's] breasts and kissed [Paz]." On November 7,

---

**3.** The Ministries' policies prohibit the provision of gifts to inmates except under extraordinary circumstances. The procedures manual states: "An easy rule of thumb to follow is: Nothing to inmates and nothing from inmates. This must be strictly observed. Inmates wanting specific items must obtain them through proper channels." The guidelines provide, however, that: "You may, if you choose, place money in an inmate account. However, these should be cases of extreme hardship and should first be cleared with a staff chaplain." Weir admitted at deposition that he overstepped his authority by giving gifts to inmates, including Paz.

1997, she wrote a letter to Weir "urging him to fulfill what she felt were his responsibilities in the Paz matter." She sent a copy of the letter to Jerry Groom ("Groom"), who worked in a leadership capacity for the Chaplaincy Department of the Texas Department of Criminal Justice, Institutional Division ("TDCJ–ID"). In his synopsis of the letter, Lampson stated that Johnson wrote Weir asking him to:

1. Remove himself from any contact with the female inmates, including phone calls or visiting the female floors of the jail.
2. Tell his wife what was going on. Chaplain Johnson wrote: "You have done devastating things."
3. Tell Jerry Groom about his "misuse of authority and sexual misconduct."

According to Lampson, Johnson wrote to Weir, stating: " 'I hope I have made my position clear ... If there have been other inmates that you have (procured) sexual favors from, please, please make that known to Jerry Groom ... I see this situation as a ticking time bomb ... On legal, moral, and spiritual grounds, you must take the offensive, and the responsibility because you are a leader.' " In response, Weir told her that he would no longer minister to female inmates on a one-to-one basis and would speak to Groom about the Paz matter.

Chaplain Alice Petteway ("Petteway") related to Lampson that Paz " 'tried to appear to be a spiritual person but in reality she was not sincere,' and that [she] 'was playing the religion game ... caused much dissention [sic] among staff and workers. She would be profane and argumentative.' " Her impression was that Paz was going to fabricate sexual allegations against Weir. She informed Lampson that "she had not heard any allegations regarding Chaplain Wier [sic] until this incident, nor has she ever seen Chaplain Wier [sic] alone with any female inmates."

Captain Jim Albers ("Albers"), an officer at the Jail, informed Lampson that he had received information from several sources regarding allegations of sexual misconduct by Weir and had referred the matter to Major Mark Kellar ("Kellar") because Weir was in his chain of command. Lieutenant Terry Enloe ("Enloe") reported to Lampson that Weir had mentioned to him between November 1997 and January 1998 that "a former (unnamed) female worker was telling her cell mates that sexual improprieties had occurred between her and Chaplain Weir." Weir advised Enloe that the "allegations were false and that the inmate was mad because she had been terminated as a Chaplain's worker and was trying to get even. Chaplain Weir said he was only guilty of being a Christian." Deputy Collier Wright ("Wright") also stated that Weir had told him that a former female inmate was making false allegations about him. Weir informed Wright that "the allegation was untrue and that the former worker was spreading this rumor because she was angry with Weir for cutting her worker band."

Lampson ascertained the following:

In the course of conducting this investigation, I, Detective Pete Lampson, determined that prior Personnel Affairs/Internal Affairs cases involving complaints of sexual misconduct against Chaplain Freddie Wier [sic] existed. The subjects of those cases, former Harris County Jail inmates Mary Bernard, Villette Rochford, and Diana Rocha, were contacted by me as part of my investigation of Complainant Olga Paz's current allegations. These three former inmates gave new sworn statements repeating their original complaints of sexual misconduct by Chaplain Freddie Wier [sic].

Mary Bernard a.k.a. Mary Lee Ross ("Bernard") advised Lampson that while incarcerated in 1993, Weir began "counsel-

ing" her. On March 10, 1993, the day of her great aunt's funeral, Weir compelled her to perform oral sex on him. In a sworn statement to Lampson, she reported:

> Chaplain Wier [sic] put his arms around me and wiped my tears away with Kleenex. He leaned against the door and unzipped his pants and asked me to give him some head. He extracted his penis. I told him I didn't want to. He had previously written down my parents' address and phone number on a Rolodex. When he extracted his penis he began talking about my parents, saying he knows a lot of people in different places and has a lot of influence, and he knows where my parents live. I felt he was saying he could hurt my family if I didn't do what he wanted, so I performed oral sex on him. He came quickly and then handed me a Kleenex. He told me to spit the matter into this Kleenex and throw the Kleenex into his wastebasket, which I did... He had freckles on his penis and had red hair and wore white jockey type underwear. He wiped his penis on a small towel. He gave me some mouth wash from his desk, which I used. He also gave me a small bottle of cologne which I put around my mouth to mask the scent.

Bernard also told Lampson that Weir fondled her breasts many times. Bernard informed the Sheriff's Department about Weir's conduct on April 10, 1993. Bernard also noted a suspected relationship between Weir and another inmate, Patsy Sampson ("Sampson"). Weir denied the allegations. Sampson also denied having a relationship with Weir and passed a 1993 polygraph examination.

Lampson found no evidence in the record that Bernard had taken a polygraph examination in 1993, although she claims she took one and was told that she passed. Bernard's cellmate, Cheryl Herbert ("Herbert"), gave a sworn statement, claiming that Bernard may have been attempting to frame someone on sexual charges. The investigation involving Bernard was closed for lack of evidence in April 1993. The Internal Affairs division claims that the address she supplied for follow-up questions was a vacant lot. Bernard,[4] currently confined in a state jail for prisoners with psychiatric problems, claims that she gave the Sheriff's Department her parents' address for future contact. She never heard from the authorities again until Lampson's 1998 investigation.

Villette Rochford ("Rochford")[5] related to Lampson that she willingly engaged in oral sex with Weir on many occasions between 1992 and 1993. According to Rochford, she did so because she "got as much out of it as Chaplain Wier [sic] did. [She] enjoyed getting out of [her] cell and going to Chaplain Wier's [sic] office, where he gave me coffee and soft drinks and allowed me to use the phone." Her conduct was reported via an anonymous letter to the Sheriff's Department. At the time, she told the Sheriff's Department that "nothing sexual happened between her and [Weir]." The file is missing the cover sheet and the investigative report, but it is undisputed that no action was taken against Weir.

Diana Rocha ("Rocha")[6] stated that in

---

4. Bernard's criminal record lists five felony convictions, including two for delivery of cocaine, two for possession of cocaine, and one for possession of a controlled substance.

5. Rochford has prior convictions for possession of a controlled substance and possession of cocaine, as well as three misdemeanor convictions, including one for driving while intoxicated.

6. Rocha has five felony convictions, two for prostitution, two for possession of a controlled substance, and three for possession of cocaine. Additionally, she has five misdemeanor convictions, two for theft, one for

November 1991 she willingly engaged in oral sex with Weir because she "was at a low point in [her] life and needed ... care from someone." The Sheriff's Department was alerted by a third party in December 1991. Weir denied the allegations, stating that he "hated the fact that the allegation came up ... and in the future would have female workers pull the female inmates." The investigation was closed as "unfounded."

Subsequent to the Paz allegations, another inmate, Bridget Storm ("Storm") alleged that she was sexually abused by Weir while incarcerated at the Jail between September 25, 1991, and December 16, 1992. She did not come forward, however, until April 1999.

At deposition, Kellar, the Jail Administrator for the County, recalled allegations of sexual misconduct by Weir as early as the mid- to late 1980s, although he remembered only two specific incidents. He also admitted that in 1992 or 1993, there were informal discussions about the impropriety of Weir's ministering to inmates of the opposite sex.

Paz filed the instant action on May 27, 1999, alleging violations of her federal civil rights under 42 U.S.C. §§ 1983, 1985, and 1986, along with a state law claim for sexual battery. On February 22, 2000, Archer was dismissed as a party to the lawsuit on Paz's motion.

II. *Analysis*

A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986);

burglary, one for driving while intoxicated, and one for driving while intoxicated under the influence of a controlled substance.

*Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348). All the evidence must be construed "in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *cert. denied,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (citing 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529, at 299 (2d ed.1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* (quoting WRIGHT & MILLER, *supra.,* at 300).

Nonetheless, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. *42 U.S.C. § 1983*

The Civil Rights Act of 1866, 42 U.S.C. § 1983, creates a private right of action for

redressing the violation of federal law by those acting under color of state law. *See Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *Migra v. Board of Educ.,* 465 U.S. 75, 82, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Texas Manufactured Hous. Ass'n, Inc. v. City of Nederland,* 101 F.3d 1095, 1106 (5th Cir.1996), *cert. denied,* 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *McIntosh v. Antonino,* 71 F.3d 29, 33 (1st Cir.1995). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights conferred elsewhere.'" *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *accord Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Jackson v. City of Atlanta,* 73 F.3d 60, 63 (5th Cir.), *cert. denied,* 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996); *Young v. City of Killeen,* 775 F.2d 1349, 1352 (5th Cir.1985).

 To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived her of a right secured by the Constitution or laws of the United States. *See American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Augustine v. Doe,* 740 F.2d 322, 324–25 (5th Cir.1984). A § 1983 complainant must support her claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *See Schultea v. Wood,* 47 F.3d 1427, 1433 (5th Cir.1995); *Fee v. Herndon,* 900 F.2d 804, 807 (5th Cir.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *Jacquez v. Procunier,* 801 F.2d 789, 793 (5th Cir.1986); *Angel v. City of Fairfield,* 793 F.2d 737, 739 (5th Cir.1986); *Elliott v. Perez,* 751 F.2d 1472, 1482 (5th Cir.1985).

 Thus, for Paz to recover, she must show that the defendants deprived her of a right guaranteed by the Constitution or the laws of the United States. *See Daniels,* 474 U.S. at 329–31, 106 S.Ct. 662; *Baker,* 443 U.S. at 139, 99 S.Ct. 2689; *Thomas v. Sams,* 734 F.2d 185, 190–91 (5th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). Paz must also prove that the alleged constitutional or statutory deprivation was intentional or due to deliberate indifference— not the result of mere negligence. *See Farmer v. Brennan,* 511 U.S. 825, 828–29, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels,* 474 U.S. at 328, 106 S.Ct. 677; *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The negligent deprivation of life, liberty, or property is not a constitutional violation. *See Campbell v. City of San Antonio,* 43 F.3d 973, 977 (5th Cir.1995); *Fraire v. City of Arlington,* 957 F.2d 1268, 1276 (5th Cir.), *cert. denied,* 506

U.S. 973, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992); *Herrera v. Millsap,* 862 F.2d 1157, 1160 (5th Cir.1989); *Simmons v. McElveen,* 846 F.2d 337, 339 (5th Cir.1988); *Young,* 775 F.2d at 1353. Moreover, to hold a defendant liable under § 1983, Paz must adduce facts demonstrating the defendant's participation in the alleged wrong. *See Murphy v. Kellar,* 950 F.2d 290, 292 (5th Cir.1992); *Jacquez,* 801 F.2d at 793.

### 1. *Local Government Liability*

Harris County argues that it is entitled to summary judgment because: (1) Weir is not an employee of Harris County and therefore there was no state action; (2) Paz has not suffered a constitutional deprivation; and (3) even if such a violation occurred, Paz has failed to identify any policy or custom of Harris County that led to the violation of her constitutionally protected rights.

The key to recovery against a governmental entity under § 1983 is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom. *See Flores v. Cameron County,* 92 F.3d 258, 263 (5th Cir.1996); *Campbell,* 43 F.3d at 977. "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001) (citing *Snyder v. Trepagnier,* 142 F.3d 791, 796 (5th Cir.1998), *cert. granted,* 525 U.S. 1098, 119 S.Ct. 863, 142 L.Ed.2d 716, *cert. dismissed,* 526 U.S. 1083, 119 S.Ct. 1493, 143 L.Ed.2d 575 (1999)). Moreover, when proceeding under § 1983, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff." *Id.*

The United States Supreme Court has expressly held that local governmental entities may be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see Languirand v. Hayden,* 717 F.2d 220, 223 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). A governmental entity may also be liable "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; *see also Languirand,* 717 F.2d at 223. The Fifth Circuit has defined official policy or custom as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir.1992) (quoting *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984)); *accord Brown v. Bryan County,* 219 F.3d 450, 462 (5th Cir.2000); *Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1304 (5th Cir.1995), *cert. denied,* 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

The first type of "policy" is characterized by formal rules and understandings which constitute fixed plans of action to be followed under similar circumstances consistently and over time. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The second type of "policy" arises from custom, *i.e.*, "conduct that has become a traditional way of carrying out policy and has acquired the force of law." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir.1984). A third type of "policy" stems from "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations.' " *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (quoting *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292). "[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which the county may be liable." *Brown*, 219 F.3d at 462. Under this type of "policy," a municipality can be liable only if the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers. *See id.* Such "authorized decisionmakers" are defined to be officials " 'whose acts or edicts may fairly be said to represent official policy' " and whose decisions may therefore result in municipal liability under § 1983. *Id.* at 480 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018).

Proof of a responsible policymaker is a necessary element for the imposition of municipal liability under § 1983. *See Piotrowski*, 237 F.3d at 578–79 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur*, 475 U.S. at 482–83, 106 S.Ct. 1292). State law determines whether a particular individual is a final decisionmaker of a governmental entity with respect to a certain sphere of activity. *See Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.), *cert. denied*, 519 U.S. 817, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996) (citing *Jett*, 491 U.S. at 737, 109 S.Ct. 2702; *Praprotnik*, 485 U.S. at 124, 108 S.Ct. 915; *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1407 (5th Cir.1995)). Furthermore, the Fifth Circuit has held that, under *Monell*, when a final policymaker makes a decision, and that decision is within the sphere of the policymaker's final authority, " 'the existence of a well-established, officially-adopted policy will not insulate the municipality from liability.' " *Id.* (quoting *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 754 (5th Cir.1993)).

"[I]t has long been recognized that, in Texas, the county Sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Id.; see also Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir.1993); *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991) (citations omitted). Hence, in 1997 and 1998, Sheriff Tommy Thomas was the final policymaker with respect to law enforcement activities of the County. In 1992 and 1993, during the Bernard inquiry, Sheriff Johnny Klevenhagen was the final policymaker.

" 'Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority.' " *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.1984)). "If actions of city employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so

frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster*, 735 F.2d at 842; *accord Bennett*, 728 F.2d at 768. Consistent with the commonly understood meaning of custom, proof of random acts or isolated incidents is not sufficient to show the existence of a custom or policy. *See Fraire*, 957 F.2d at 1278 (citing *Rodriguez v. Avita*, 871 F.2d 552, 554 (5th Cir.), *cert. denied*, 493 U.S. 854, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989)); *accord Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir.1989). " 'Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy' as required for municipal section 1983 liability." *Campbell*, 43 F.3d at 977 (quoting *Bennett*, 728 F.2d at 768 n. 3); *accord Piotrowski*, 237 F.3d at 581. Thus, "[a] customary municipal policy cannot ordinarily be inferred from single constitutional violations." *Id.* To demonstrate a governmental policy or custom under § 1983, a plaintiff must at least show:

a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force.

*Fraire*, 957 F.2d at 1278 (citing *Languirand*, 717 F.2d at 227–228). Only if the plaintiff demonstrates that her injury resulted from a " 'permanent and well settled' " practice may liability attach for injury resulting from a local government custom. *See Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

Moreover, a governmental entity does not incur liability under § 1983 unless there exists "a direct causal link between a municipal policy or custom and the alleged

constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see Piotrowski*, 237 F.3d at 580; *Burns v. City of Galveston*, 905 F.2d 100, 102 (5th Cir. 1990). "*Monell* describes the high threshold of proof by stating that the policy must be the 'moving force' behind the violation." *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018); *see also City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197. Hence, "the plaintiff must initially allege that an official policy or custom 'was a cause in fact of the deprivation of rights inflicted.' " *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir.1994)). Nevertheless, "[t]his connection must be more than a mere 'but for' coupling between cause and effect." *Fraire*, 957 F.2d at 1281 (citing *City of Canton*, 489 U.S. at 386, 109 S.Ct. 1197; *Tuttle*, 471 U.S. at 823, 105 S.Ct. 2427). The plaintiff must also establish that a government policy or custom was the proximate cause of the injuries sustained. *See Huffman v. County of Los Angeles*, 147 F.3d 1054, 1059 (9th Cir.1998), *cert. denied*, 526 U.S. 1038, 119 S.Ct. 1333, 143 L.Ed.2d 498 (1999); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *cert. denied*, 520 U.S. 1117, 117 S.Ct. 1249, 137 L.Ed.2d 330 (1997); *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir.1996); *Horn by Parks v. Madison County Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir.), *cert. denied*, 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990); *Doe v. District of Columbia*, 701 F.2d 948, 953 (D.C.Cir.1983); *Rheuark v. Shaw*, 628 F.2d 297, 305 (5th Cir.1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981). "Pointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection under *Monell*. Rather, the policy must be the

proximate cause of the section 1983 injury." *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 837 (9th Cir.1996), *cert. denied,* 519 U.S. 1111, 117 S.Ct. 950, 136 L.Ed.2d 837 (1997) (citing *Mann v. City of Tucson,* 782 F.2d 790, 793 (9th Cir.1986)).

■ In addition, the "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Bryan County,* 520 U.S. at 411–12, 117 S.Ct. 1382. The Supreme Court has explained:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Id.* at 404, 117 S.Ct. 1382; *see Spiller,* 130 F.3d at 167 (quoting *Meadowbriar Home For Children, Inc. v. Gunn,* 81 F.3d 521, 533 (5th Cir.1996)). "Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Bryan County,* 520 U.S. at 415, 117 S.Ct. 1382. Thus, plaintiffs seeking to recover against a governmental entity under § 1983 "must first prove a direct causal link between the [governmental] policy and the constitutional deprivation; they then must establish that the County consciously enacted a policy reflecting 'deliberate indifference' to the constitutional rights of its citizens." *Snyder,* 142 F.3d at 795–96 (citing *City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197); *see Hare v. City of Corinth,* 74 F.3d 633, 649 n. 4 (5th Cir.1996). "[D]eliberate in-

difference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan County,* 520 U.S. at 410, 117 S.Ct. 1382.

■ Furthermore, a governmental entity may not be held liable for the acts of its employees under a theory of *respondeat superior. See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Piotrowski,* 237 F.3d at 578; *Colle,* 981 F.2d at 244; *Williams v. Luna,* 909 F.2d 121, 123 (5th Cir.1990); *Rodriguez,* 871 F.2d at 554. "Municipalities are not vicariously liable for the actions of their employees under § 1983. Municipal liability inures only when the execution of a local government's policy or custom causes the injury." *Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir.1996). In order to hold a governmental entity liable for the acts of a nonpolicymaking employee, the plaintiff must allege and prove that: "(1) a policy or custom existed; (2) the governmental policy makers actually or constructively knew of its existence; (3) a constitutional violation occurred; and (4) the custom or policy served as the moving force behind the violation." *Meadowbriar Home for Children, Inc.,* 81 F.3d at 532–33. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan County,* 520 U.S. at 405, 117 S.Ct. 1382 (citing *City of Canton,* 489 U.S. at 391–92, 109 S.Ct. 1197). "These requirements must not be diluted for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.'" *Snyder,* 142 F.3d at 796 (quoting *Bryan County,* 520 U.S. at 415, 117 S.Ct. 1382).

## a. *State Action*

At the outset, it must be determined whether Weir's relationship with the County is sufficient to impose governmental liability. The determination of state action under § 1983 is an issue of law to be determined by the court. *See Jennings v. Patterson,* 488 F.2d 436, 438 (5th Cir.1974). The County alleges that Weir:

> is not an employee of Harris County, but is an employee of Jail Chaplaincy Ministries, Inc., a private corporation that contracted with Harris County to supply religious and counseling services for the Harris County jail as required by the rules promulgated by the Texas Commission on Jail Standards.

The County further argues that Weir testified at deposition that he was employed by the Ministries and was not an employee of the County. The County also points to Weir's deposition testimony in which he stated that a chaplain could not direct that an inmate be placed in administrative separation. Additionally, Kellar has submitted an affidavit stating:

> Since 1985 through the present Harris County has contracted with a corporation that is an independent contractor known as Jail Chaplaincy Ministries, Inc. to provide the required counseling and religious services to inmates in the Harris County jail ... Fred E. Weir is not an employee of the Harris County Sheriff's Department or of Harris County, Texas. Fred E. Weir provided chaplaincy services in the Harris County jail through the contract with Jail Chaplaincy Ministries, Inc. To the best of my knowledge Fred E. Weir is an employee and/or corporate officer of Jail Chaplaincy Ministries, Inc.

The County did not submit a copy of the 1997 contract between the County and the Ministries, claiming that same contract, except for monetary provisions, was in force between 1994 and 1998. The County submitted the 1994–95 contract, which states in relevant part:

> For a term of twelve months (12) months, commencing August 1, 1994, and ending on July 31, 1995 (unless sooner ended in accordance with the provisions hereof), Jail Chaplaincy shall coordinate and execute a religious services plan for inmates of the Harris County Jail which meets the requirements of Jail Standard Rule 22.001(e). The plan shall include:
>
> 1. staffing a twenty-four hour on-call service.
>
> 2. within the confines of applicable security restrictions, providing inmates with access to religious leaders in addition to normal visitation procedures which allows inmates to communicate with a minister of his/her choosing and, if requested, participate in group and personal counseling; and
>
> 3. providing inmates with access to religious services normally available within the community through visitation and volunteer programs which are consistent with the individual faith of each inmate.
>
> \* \* \* \* \* \*
>
> Jail Chaplaincy agrees to perform the work hereunder in accordance with generally accepted standards applicable to jail chaplains and shall use that degree of care and skill commensurate with other professionals in the same field. In this connection, Jail Chaplaincy shall comply with all applicable federal, state and county laws, regulations, rules and ordinances, and also written jail practices and procedures which may be promulgated by the Sheriff.
>
> \* \* \* \* \* \*
>
> It is further agreed that in the performance of all obligations undertaken by

this agreement, Jail Chaplaincy is an independent contractor with the right to supervise, manage, control and direct the performance of chaplaincy services. The County shall look to Jail Chaplaincy for results only and the County shall have no right at any time to direct or supervise chaplains provided to Harris County in the performance of such chaplaincy services or as to the manner, means or method in which the chaplaincy services are performed.

In 1998, the independent contractor language of the contract was changed slightly:

It is further agreed that in its performance of all obligations set forth in this agreement, Jail Chaplaincy is an independent contractor with the right to supervise, manage, control and direct the performance of chaplaincy services. The Sheriff shall look to Jail Chaplaincy for results only, and subject at all times to the provisions of Section II hereinabove, shall not direct or supervise chaplains provided by Jail Chaplaincy in the performance of such chaplaincy services or with respect to the manner, means or methods in which the chaplaincy services are performed.

■ "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). The Supreme Court has traditionally utilized a two-prong approach to assess the existence of state action:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a

person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Like the state action requirement of the Fourteenth Amendment, the state action element of § 1983 excludes from its coverage "merely private conduct, however discriminatory or wrongful." *Sullivan,* 526 U.S. at 50, 119 S.Ct. 977; *see Richardson v. Fleming,* 651 F.2d 366, 371 (5th Cir.1981).

■ When private conduct is involved, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). "If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes." *Id.* at 930 n. 2 (quoting *Lugar,* 457 U.S. at 935, 102 S.Ct. 2744). The criteria for determining state action lack "rigid simplicity," and "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.* at 930, 102 S.Ct. 2744 (citing *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 193, 196, 109

S.Ct. 454, 102 L.Ed.2d 469 (1988); *Polk County v. Dodson*, 454 U.S. 312, 324–26, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)).

 A challenged activity may be state action "when it results from the State's exercise of 'coercive power,' when the State engages in 'significant encouragement, either overt or covert,' or when a private actor operates as 'a willful participant in joint activity with the State or its agents.'" *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Lugar*, 457 U.S. at 941, 102 S.Ct. 2744). State action can also occur when a "nominally private entity . . . is controlled by an 'agency of the State,'" or when it has been delegated a public function by the State. *Id.* (quoting *Pennsylvania v. Board of Dirs. of City Trusts of Philadelphia*, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957) (citing *West*, 487 U.S. at 56, 108 S.Ct. 2250; *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627–28, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991))). In addition, state action may be found when a private entity is "'entwined with governmental policies' or when government is 'entwined in [its] management or control.'" *Id.* (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)). "[T]he character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies." *Id.* at 931 (citing *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 393–94, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995)). The Supreme Court has recognized that although an organization appears to be private, it may be an arm of the State through "winks and nods." *Id.* at 933 n. 4 (stating that "if formalism were the sina qua non of state action, the doctrine would vanish owing to the ease and inevitability of evasion, and for just that

reason formalism has never been controlling").

 In this case, the parties do not dispute that under Texas law, Harris County is obligated to provide prisoners access to religious services. During the period of Paz's 1997 incarceration, the law provided:

> Each facility shall have and implement a written plan, approved by the commission, governing religious access comparable to that normally available in the community. Where group services are held, provisions shall be made for the removal of inmates not wishing to participate. The plan shall:
>
> (1) allow for visitation and volunteer programs; and
>
> (2) provide for access to religious leaders in addition to normal visitation and shall allow an inmate to communicate with a minister of his/her choosing consistent with security restrictions.

37 TEX. ADMIN. CODE ANN. § 291.5 (West 1995).

Kellar testified at deposition that one of his subordinates and a representative of the Ministries drafted the Ministries' Operational Procedures and Guidelines for Assistant Chaplains, which was then forwarded to him for approval. Kellar also stated that the Sheriff's Department maintains the procedures and guidelines for the Ministries. The contract specifically requires the Ministries to comply with all applicable federal, state, and county laws as well as all "written jail practices and procedures which may be promulgated by the Sheriff." Despite the contractual provision stating that the Sheriff "shall not direct or supervise chaplains provided by Jail Chaplaincy in the performance of such chaplaincy services," it is undisputed that after Paz's complaint, Kellar restricted

Weir from movement within the Jail's female floors.

The evidence reflects that the Sheriff's Department determined who was allowed access to the Jail, where they could go, when they could come in, and the circumstances under which they could enter.[7] It is uncontested that the Sheriff's Department issued identification badges to Weir and the other chaplains which allowed them "limited access to inmates," permitting their presence in areas of the Jail that are off-limits to members of the public. According to Kellar, after Paz's outcry in 1998, he personally told Weir "not to go on the female areas of the jail—into the female areas of the jail and to restrict his movement to 701 San Jacinto, if possible, and if he had occasion to be at 1301 where the females are housed, that he would restrict his movement to his office area on the 3rd floor."

The record further reflects that the Ministries used unpaid inmate workers to perform routine office and administrative work. The chaplains selected certain inmates to work in the Ministries' office, which required them to be specially classified by Jail administrators. These inmates were apparently permitted to remain unsupervised in the Ministries' office during at least a portion of the day. According to Archer, the inmate workers could be reclassified by having their "band broken" by the chaplains, precluding them from further work for the Ministries. Archer explained in her affidavit:

> The Ministries also utilize the services of unpaid inmate workers to do routine office and administrative work. Olga Paz was one such inmate worker. Inmates who wish to work in the Ministries must be approved, or "classified," to do so, and receive a colored band indicating their classification. In the event of disciplinary problems with an inmate worker, I or another chaplain may "break the band" of the inmate. The inmate may then be re-classified by the Harris County Sheriff's Office. This was exactly the experience of Olga Paz, whose band I "broke" in 1998, causing her to lose her status as a Ministry inmate worker.

7. The Standing Policies for Inmate Management and Standard Operating Procedures for Inmate Management, which Kellar admits to drafting, state:

3.56 *ACCESS TO CLERGY.* Upon presentation of appropriate identification, an ordained minister may visit an inmate between the hours of 7:00 a.m. and 10:00 p.m. daily, upon approval of the Chaplain's Department or a watch supervisor.

3.61 *VISITORS AND PERSONS WITH BUSINESS IN JAIL.*

A. In addition to persons employed by the Harris County Sheriff's Department, a number of ancillary staff members may be required to perform operations such as building maintenance, chaplaincy, inmate education and mental health services. Ancillary staff members shall be subject to thorough screening as determined by the Bureau Commander. All ancillary staff members shall be familiar with and shall comply with the rules and regulations regarding security as specified in this manual.

B. Persons visiting inmates shall be restricted to the areas designated for that purpose. All visitors entering the jail area are subject to search for the purpose of discovering contraband. Visitors shall at all times follow the procedures posted in the visitor control area.

C. Persons with official business concerning inmates, including attorneys, outside agency personnel, ministers and others, shall be restricted to areas designed for that purpose. Persons and such objects as may be necessary for official business (briefcases, purses, Bibles, etc.) shall be subject to search for the purpose of discovering contraband.

D. No person, other than staff members or ancillary staff members, shall be permitted in a restricted area without the approval of the Jail Captain or his designee.

Hence, while the classification of inmates is generally an administrative function of Jail officials, in this instance, chaplains at the Jail have direct input in certain classification decisions.

Furthermore, the investigation into Weir's activities, on every occasion, was performed by the Internal Affairs Division of the Sheriff's Department. Lampson testified that "to be referred [to Internal Affairs] you would naturally assume that it was an internal situation ... But referred, you know, they would come from various divisions of the jail or the department anywhere." During the investigation of the Bernard allegations, the Internal Affairs Division labeled the investigation as an "[a]llegation of censurable conduct by *HCSD Staff Member.*" (Emphasis added.) The report also refers to Weir's "peculiar position with this department."

Based on the foregoing, under either an entwinement analysis or a delegated duty theory, Weir, as head chaplain at the Jail, was acting under color of state law when interacting with Paz and other female inmates. In this instance, the County delegated to a private corporation its duty under state law to provide religious services to inmates and granted this entity broad access to inmates when providing such services. Under similar circumstances, the Sixth Circuit held a volunteer chaplain at a state prison to be a state actor. *See Phelps v. Dunn,* 965 F.2d 93, 102 (6th Cir.1992). In *Phelps,* the court noted that the chaplain had signed an agreement to abide by all institutional policies and procedures, reported to the established line of chapel command, and was distinguishable from guest speakers and musicians who did not provide regularly scheduled services. *See id.* Specifically, the volunteer chaplain was given privileges granted only to prison employees, "including special training and an institutional identification card." *Id.* Hence, although the chaplain retained the general attrib-

utes of a clergyman performing services in a non-prison setting, he was acting under color of state law when conducting services in the prison setting. *See id.* Here, the symbiotic nature of the relationship between the Ministries, Weir, and the Jail was far more pronounced than the situation in *Phelps,* affirming the existence of state action in this context.

■ In addition, with respect to Paz's sexual assault claim, while "[a]s a general rule, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause,'" an exception exists in the prison setting. *Randolph v. Cervantes,* 130 F.3d 727, 730 (5th Cir.1997), *cert. denied,* 525 U.S. 822, 119 S.Ct. 65, 142 L.Ed.2d 51 (1998) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). "[T]he Supreme Court has explained that a state may have the constitutional duty to protect an individual from private violence if the state, 'through incarceration, institutionalization, or other similar restraint of personal liberty,' has limited the individual's freedom to act on her own behalf." *Id.* (quoting *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998). The Fifth Circuit has explained that the *DeShaney* special relationship exists "'only when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against [her] will* ....'" *Id.* (emphasis in original) (quoting *Walton v. Alexander,* 44 F.3d 1297, 1302 (5th Cir.1995)). "'Absent this "special relationship," the state has no duty to protect nor liability from failing to protect a person under the due process clause of the Fourteenth Amendment from violence at the hands of a private actor.'" *Id.* (quoting *Walton,* 44 F.3d at 1306).

■ "Of course, the Due Process Clause, both substantive and procedural, may be triggered when the State, by the

affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement." *DeShaney,* 489 U.S. at 200 n. 8, 109 S.Ct. 998. The Fifth Circuit has recognized that "[t]he duties owed by the state to persons in the state's custody have been articulated differently in different contexts." *Walton,* 44 F.3d at 1301 n. 3. In the Fifth Circuit, "[t]o state a § 1983 claim for violation of the Due Process Clause, [the Plaintiff] must show that [she] has asserted a 'recognized "liberty or property" interest within the purview of the Fourteenth Amendment, and that [she was] intentionally or recklessly deprived of that interest, even temporarily, under color of state law.'" *Id.* at 1301–02 (quoting *Griffith v. Johnston,* 899 F.2d 1427, 1435 (5th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991)).

 It is well recognized, however, that a "prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer,* 511 U.S. at 828, 114 S.Ct. 1970. "The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* at 832, 114 S.Ct. 1970 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Under the Eighth Amendment, a prisoner "must prove both that [she] is incarcerated under conditions 'posing a substantial risk of serious harm,' and that the prison official's state of mind is one of 'deliberate indifference' to the prisoner's health or safety." *Horton v. Cockrell,* 70 F.3d 397, 401 (5th Cir.1995) (quoting *Farmer,* 511 U.S. at 828, 114 S.Ct. 1970); *see Giron v. Corrections Corp. of Am.,* 191 F.3d 1281, 1285 (10th Cir.1999). "There is

no concise definition of what types of prison conditions pose a 'substantial risk of serious harm' under the Eighth Amendment. Instead we examine the component of the test 'contextually,' making sure to be responsive to 'contemporary standards of society.'" *Horton,* 70 F.3d at 401 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). The court must "consider 'whether society considers the risk ... to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.'" *Id.* (quoting *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). "Prison authorities must protect not only against current threats, but also must guard against 'sufficient imminent dangers' that are likely to cause harm in the 'next week or month or year.'" *Id.* (quoting *Helling,* 509 U.S. at 33, 113 S.Ct. 2475). Under any scenario, however, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Therefore even if Weir and the Ministries were found not to be state actors, liability could still attach to the County under a failure to protect theory.

#### b. *Constitutional Violation*

As another threshold matter, it must be determined whether Paz has adduced sufficient evidence of a constitutional violation. Paz's complaint may be construed as alleging constitutional deprivations stemming from (1) an infringement of her Fourteenth Amendment right to bodily integrity and (2) an abridgement of her First Amendment right to free speech.

### (1). *Sexual Assault*

 "[T]he Due Process Clause of the Fourteenth Amendment confers upon an individual the right to be free of state-occasioned damage to her bodily integrity . . . ." *Randolph*, 130 F.3d at 730; *accord Walton*, 44 F.3d at 1302 (" 'the right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process' ") (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451 (5th Cir.), *cert. denied*, 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994)). This type of claim "arises under the substantive, rather than the procedural component of the Due Process Clause." *Id.* Substantive due process " 'protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them." ' " *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (quoting *Daniels*, 474 U.S. at 331, 106 S.Ct. 662)).

 The County argues that the evidence demonstrates that any sexual contacts between Weir and Paz were consensual in nature and did not violate the Constitution. Paz, however, has adduced sufficient evidence to withstand summary judgment with respect to the existence of sexual contacts between Paz and Weir as well as the consensual nature of any such contacts. To the extent the County contends that there was no sexual contact between Weir and Paz, a fact issue on this point exists in light of Paz's affidavits, her deposition testimony, Weir's deposition, and Lampson's report. Moreover, with regard to consent, while Paz acknowledged at deposition that she willingly engaged in sexual activity with Weir in order to provide gifts for her son, such an admission is not necessarily dispositive of the issue. Under Texas criminal law,

sexual assault is without consent of the other person if

(8) the actor is a public servant who coerces the other person to submit or participate; [or]

\* \* \* \* \* \*

(10) the actor is a clergyman who causes the other person to submit or participate by exploiting the other person's emotional dependency on the clergyman in the clergyman's professional character as spiritual adviser.

TEX. PEN. CODE ANN. § 22.011(b) (West 1997). The Fifth Circuit has looked to criminal statutes when determining the issue of consent in the § 1983 context. *See Taylor Indep. Sch. Dist.*, 15 F.3d at 451 (holding that 15-year-old school girl could not consent to sexual assault by public schoolteacher). State actors may not take advantage of their positions to engage in sexual misconduct. *See Rains County Indep. Sch. Dist.*, 66 F.3d at 1406 (recognizing that plaintiff "suffered an actionable deprivation of her liberty interest in freedom from sexual abuse by persons wielding state authority").

Paz testified at deposition that she initially went to Weir in search of spiritual guidance. She stated that in her first meeting with Weir:

I wanted to talk to him seriously about the Bible and then he started talking to me about how beautiful I was and he got up out of his chair and came around the desk. And I found out about what he was all about . . . .

She further testified:

Q. And how did he know what you were willing to do?

A. Because that first meeting that we had, him and me, I could see in his eyes that he was a trick.

Q. Did he—did you tell him that you would be willing to do certain things?

A. I just agreed with what he said, that, you know, I could do, you know—"I can do things for you and stuff." You know, you read between the lines. Do you know what I'm saying?

Q. Okay. It's real important. And I understand that it's been a while and sometimes you can't remember everything.

But that conversation, he told you that he could do certain things for you?

A. Uh-huh.

Q. And he said that: "I can do certain things for you?"

A. "I can do things for you." Yeah.

Q. And how did this offer come up?

A. What offer?

Q. That he could do certain things for you.

A. When he was talking to me and told me that I was beautiful and that, you know, he had been working for Harris County Jail for, what, 15, 16 years, whatever it was, and that he could—he could do things for me.

Q. And what did you say then?

A. I told him that—I just understood what he was saying. I really didn't tell him anything.

Q. So you just—

A. I just agreed. I said, "Yeah. Okay."

She later explained why she chose not to ask her parents to purchase gifts for her son:

Q. And you couldn't ask your mom and dad to buy your son these things for you?

A. Of course. But I wanted to do it. I saw the opportunity—I've been in the streets for so long, and I had missed so many birthdays. And I

had been using men for all my reasons, and now I saw an opportunity to use this one for my child. I could get him—I was in the right state of mind. I mean, I wasn't drunk. I wasn't high. You know what I'm saying?

Q. So when you say you wanted to do it, you were going to use—

A. I wanted my baby boy to open a present that was sent by his mom.

Q. But, in fact, it would be Freddie Weir who would be—

A. I used Freddie Weir to get it, yeah.

Paz also commented about her purported misgivings concerning the relationship:

Q. Did it bother you that he was doing these things to you?

A. Yes.

Q. Did you tell him that?

A. No.

Q. Why not?

A. I did once. I pointed out to him in the Bible where that [sic] people in his position would get punished twice as hard for doing what they were doing, you know. And that's when he told me that the Lord forgives us for what we've done, what we're doing, and we're going to do because he also already knows that we're under the Grace of God. You know, we're under Grace; and everything is okay. We're going to be forgiven anyway.

As noted above, in her 1998 affidavit, Paz stated:

[Weir] asked to talk to me in his office one day and he told me if I was doing alright, how I was feeling and told me that I was a special child in the eyes of "God." He also told me and showed me in the bible where we are forgiven for all our sins that we have committed and the

sins we will commit because Jesus Christ died for us so we could go directly to "God" and ask for forgiveness. And than [sic] he told me that we were under grace because of Jesus Christ. He told me I was a very special person and a very beautiful woman.

According to Paz, Weir then proceeded to fondle her. Paz further swore:

I had looked to him for the spiritual help I needed and he took advantage of my confusion and vulnerable position.

\* \* \* \* \* \*

I couldn't take the pressure or the guilt of playing with the "Almighty" like that. "God" I knew, now that I knew he existed, was watching me and I couldn't take it. I wanted to get away from that kind of life. I knew I was doing wrong but he Chaplain Weir would bring up bible scripture to make me feel that it was O.K. about want [sic] were doing.

Hence, on the issue of consent, genuine issues of material fact exist as to whether Weir coerced Paz or used his position as a Jail chaplain to prevail upon her to engage in repeated sexual acts, while simultaneously assuring her that God would forgive her actions. *See* TEX. PEN. CODE ANN. § 22.011(b)(8), (10). Consequently, summary judgment is unavailable on the issues of sexual contact and consent.

### (2). *Retaliation*

Paz further claims that she was retaliated against for exercising her First Amendment right to speak out about Weir's conduct. Specifically, she alleges that she was placed in administrative separation in May 1998 after complaining about Weir's actions. The County argues that the nature of the alleged retaliation—being placed in administrative separation—does not constitute a constitutional deprivation, and, therefore, Paz is not entitled to relief.

■ "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir.1998). To establish causation, the plaintiff must demonstrate that "but for the retaliatory motive the complained of incident ... would not have occurred." *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir.), *cert. denied*, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997); *accord Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995), *cert. denied*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996). "This places a significant burden on the inmate. Mere conclusionary [sic] allegations of retaliation will not withstand a summary judgment challenge." *Id.* "The inmate must produce direct evidence of motivation or 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Id.* (quoting *Cain v. Lane*, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)). "The relevant showing ... must be more than the prisoner's 'personal belief that he is the victim of retaliation.'" *Johnson*, 110 F.3d at 310 (quoting *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995), *cert. denied*, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997)). Claims of retaliation are generally "regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Woods*, 60 F.3d at 1166 (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir.1994), *cert. denied*, 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995)).

■ Although a disciplinary report which reflects a guilty finding may be considered as probative evidence that there was no retaliation, the court's "concern is whether there was retaliation for the exercise of a constitutional right, separate and apart from the apparent validity [or inval-

idity] of the underlying disciplinary report." *Id.* "An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, which taken for a different reason, might have been legitimate." *Id.*

As the County points out, the Due Process Clause does not protect every change in the conditions of confinement having a substantial, adverse impact on a prisoner. *See Sandin v. Conner,* 515 U.S. 472, 487, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (citing *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)); *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). In addition, it has long been recognized that a prisoner has no inherent constitutional right to any particular security classification, time-earning status, or custody level. *See Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Moody,* 429 U.S. at 88 n. 9, 97 S.Ct. 274; *Malchi v. Thaler,* 211 F.3d 953, 959 (5th Cir.2000); *Harper v. Showers,* 174 F.3d 716, 719 (5th Cir.1999); *Whitley v. Hunt,* 158 F.3d 882, 889 (5th Cir.1998); *Wilson v. Budney,* 976 F.2d 957, 958 (5th Cir.1992); *Moody v. Baker,* 857 F.2d 256, 257–58 (5th Cir.), *cert. denied,* 488 U.S. 985, 109 S.Ct. 540, 102 L.Ed.2d 570 (1988). Even though the result of the retaliation may be constitutional, if retaliation existed and a constitutional right was violated, then the plaintiff may still be entitled to relief. *See Allah v. Seiverling,* 229 F.3d 220, 224 (3d Cir.2000) ("[r]etaliation may be actionable, however, even when the retaliatory action does not involve a liberty interest"); *Woods,* 60 F.3d at 1166; *accord Mount Healthy City School District Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (an untenured school teacher who could be discharged for any reason and had no right to a hearing could nevertheless establish a claim to reinstatement if the decision not to rehire was made because of his exercise of pro-

tected First Amendment freedoms); *Stanley v. Litscher,* 213 F.3d 340, 343 (7th Cir.2000) (plaintiff stated a claim for retaliatory transfer even though no liberty interest was involved in transfer); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999) (same); *Jackson v. Cain,* 864 F.2d 1235, 1248 (5th Cir.1989) (state not entitled to summary judgment when a fact issue existed over inmate's transfer from one prison work crew to another); *see also Thaddeus–X v. Blatter,* 175 F.3d 378, 386 (6th Cir.1999) ("government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right"). The retaliation, however, must have been more than *de minimis. See Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (citing *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Thaddeus–X,* 175 F.3d at 397; *Crawford–El v. Britton,* 93 F.3d 813, 826 (D.C.Cir. 1996), *vacated on other grounds,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *ACLU of Md. v. Wicomico County,* 999 F.2d 780, 786 n. 6 (4th Cir.1993); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir. 1982)).

In this instance, Paz has demonstrated that, as an inmate in the Jail, she had a specific constitutional right to free speech. "A prison inmate is entitled to [her] First Amendment right to freedom of expression so long as it is not inconsistent with [her] status as a prisoner and does not adversely affect a legitimate state interest." *Jackson,* 864 F.2d at 1248 (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). "Prison walls do not form a barrier separating prison inmates from the protections of the

Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Nevertheless, prisoners' constitutional rights may be limited for valid penological objectives, "including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254.

"[S]peech concerning matters of public interest 'is more than self-expression; it is the essence of self-government.'" *Davis v. Ector County,* 40 F.3d 777, 782 (5th Cir.1994) (quoting *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "There is perhaps no subset of 'matters of public concern' more important than bringing official misconduct to light." *Id.* (citing *Thompson v. City of Starkville,* 901 F.2d 456, 463 (5th Cir. 1990)). " '[T]he disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a [law enforcement agency.]'" *Id.* (quoting *Brawner v. City of Richardson,* 855 F.2d 187, 192 (5th Cir. 1988)).

■ Regarding her alleged disciplinary offense, the investigating officer wrote:

On Monday, May 18, 1998, I Deputy D.K. Waters, Badge # 3166 was assigned to 11D. At approximately 1400 hrs. Sergeant Rankin informed me Inmate Paz, Olga, SPN # 01098864 had returned from court and without permission had walked over to the chaplain's office and demanded to see Chaplain Archer. See Attached Statement from Inmate Darling SPN # 00814384 Chaplain Archer's worker. I talked to Inmate Paz who stated she had received

permission to walk over to the Chaplain's Office ... Inmate Paz was served with a confirmation of service for 2316 conduct which disrupts classification notified.

Inmate Darling, a witness to the incident, wrote:

I Patricia Darling # 814384 4D6 was working for Chaplain Archer on 5–18–98. When Olga Paz from 11D3 came back from court wanting to see the chaplain. . Ms. Archer was not in the office. Ms. Paz (Inmate) was upset, cussing, loudly, saying that Chaplain Archer needed to come see her. Then stated, "No, she *will* come and have me moved." She waited cussing back and forth outside the Chaplain office door. I talked to 2 deputies about how aggravated Olga Paz was because I was concerned for Ms. Archer. Because Olga was acting very throwed [sic] off!! Angry and hyped up also. When Olga was talking about her court day she started she wasn't taking anymore "fucking shit."

On June 11, 1998, while housed in administrative separation, Paz wrote a letter to Jail officials, stating in relevant part:

I am currently being housed in a disciplinary segragation [sic] tank. I am lock-down [sic] for 23 hours out of the day and I want to know if there are any charges against me and if there are, I want to know why I have not gone to "Disciplinary Court."

I had an officier [sic] check the computer and see if there was a reason why I was in here and the officier [sic] told me that it was orders from Lt. Moore.

Chaplain Archer told me on the 20th of May [1998] that she had Lt. [Gerald] Moore put me in here so I could get closer to the Lord. In her opinion she thinks that by spending some time alone confined to a cell 23 hrs. out of the day

will help my relationship with the "Almighty God." She also told me that I need to get rid of a "Jesabel [sic] Spirit" that she, professes with her own mouth, that I'm possesed [sic] with.

Paz has presented sufficient evidence from which it could be inferred that she was placed and maintained in administrative separation as a result of the exercise of her First Amendment rights. She has produced evidence that Archer initially requested Lieutenant Gerald Moore ("Moore") to place Paz in administrative separation and that she was kept in lockdown for another twenty-two days despite being found not guilty of the disciplinary charge. According to Paz's deposition, it was during this same time frame that she informed a Harris County employee known as "Mr. Woe," who worked in the Jail commissary, about her sexual contacts with Weir. The County has articulated no valid penological interest in keeping Paz confined in administrative separation after she was absolved of the disciplinary infraction. In the absence of a countervailing explanation, it could be inferred that Paz was placed and kept in separation, away from the general population, to preclude her from repeating her allegations against Weir, thus creating a genuine issue of material fact on the issue of First Amendment retaliation.

### c. *Policy or Custom*

Harris County further argues that Paz has failed to demonstrate a controlling policy or custom on the part of Harris County or to identify a relevant county policymaker. In *Piotrowski*, the Fifth Circuit made clear that the plaintiff must demonstrate three elements in order for § 1983 liability to attach: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." 237 F.3d at 578.

### (1). *Sexual Assault*

██ In this instance, as noted above, the Sheriff served as the final policymaker for the County on matters of law enforcement. *See Gonzalez*, 996 F.2d at 754; *Colle*, 981 F.2d at 244; *Turner*, 915 F.2d at 136. The record reflects the Sheriff delegated policymaking functions regarding the operation and administration of the Jail to various subordinates. If an official has been delegated policymaking authority, "those individuals are the policymakers." *Piotrowski*, 237 F.3d at 579 n. 20 (citing *Webster*, 735 F.2d at 841); *see Monell*, 436 U.S. at 694, 98 S.Ct. 2018 ("it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible"); *Brown*, 219 F.3d at 457 n. 9. At deposition, Kellar testified:

Q. How long have you been employed in your capacity as the jail administrator?

A. Since approximately 1985. Let me clarify. We have reorganized several times, and some of the specifics have changed, but I've been in some type of administrative capacity with the jail since the mid-eighties.

Q. Describe for me what they [sic] your administrative duties entail. What are you responsible for?

A. That would be the overall operation of the jail system—or at least parts of the jail system. In Harris County we house, oh, over the years, anywhere from 6,000 to 14,000 inmates at any given time. And that is a large operation. Presently our budget is somewhere in the neighborhood of $120 million per year. We have employed approximately 2400 individuals. And when—to provide a jail service for Harris County,

and that would include everything from food service to programs for inmates, security for inmates, classifying inmates, booking and releasing inmates, and also court bailiffs, that is an extension of the criminal justice system. And my duties would include general administrative duties over those operations.

Q. Describe what programs you're charged with oversight.

A. At the present time we have just recently had a change, and I've been able to put that off on other people, but over the years my duties have included educational programs, recreational programs, religious programs and things for the benefit of inmates.

Q. The Jail Chaplaincy Ministry, is that one of the religious programs of which you have had oversight?

A. That is correct.

Q. During what period of time have you overseen the Jail Chaplaincy Ministry?

A. From approximately 1985 until early this year, until the year 2000, I was in charge of that program.

\* \* \* \* \* \*

Q. I failed to ask you: To whom do you report directly?

A. I report to the chief deputy of Harris County.

Q. His name is, or her name?

A. His name is D.V. Macaskill.

Q. And to whom does he report directly?

A. He reports to Sheriff Tommy Thomas.

\* \* \* \* \* \*

Q. I understand you then, Major, to say that the operational procedures for the Jail Chaplaincy Ministry, while they may be referred to in the Standing Policies for Inmate Management, will nonetheless be a separate and discreet [sic] document. Is that correct?

A. That's correct.

Q. Okay. Likewise, the Jail Chaplaincy Ministry Guidelines For Assistant Chaplains, will that be a separate and discreet [sic] document from the Standing Policies For Inmate Management?

A. Yes, it will, but they should be put together so that there's no conflict in that the—the Inmate Management document was, in fact, the parent document, and the Jail Chaplaincy document was a procedural guideline within the general overview that was established through the large manual, then it would flow through the small manual.

Q. Okay. Who drafted—Well, that may be a poor question.

Who is responsible for the drafting of the Standing Policies For Inmate Management?

A. That would be me.

Q. Okay. Who drafted or is responsible for drafting the Jail Chaplaincy Ministry Operational Procedures?

A. That would be a combination of the various captains who may have been assigned to oversee and coordinate the program at the time. And they, working with the chaplains themselves, developed the guidelines, and then I would have approved those guidelines.

Q. Likewise, the—would be the same for the Jail Chaplaincy Ministry—

A. That's correct.

Q. —Guidelines for Assistant Chaplains?

A. Yes.

The record indicates that Kellar was the relevant policymaker, as he was authorized by the Sheriff to make policy for the Jail, drafted the Standing Policies for Inmate Management, and approved the Ministries' operational procedures. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Piotrowski,* 237 F.3d at 579 n. 20; *Webster,* 735 F.2d at 841.

 Further, it is well established that "a policy may be evidenced by custom" and that the County may incur liability because of "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations.'" *Bryan County,* 520 U.S. at 410, 117 S.Ct. 1382 (quoting *Pembaur,* 475 U.S. at 485, 106 S.Ct. 1292); *Piotrowski,* 237 F.3d at 579. According to Kellar's affidavit, "Neither Harris County nor the Harris County Sheriff's Department controls the details of how the chaplains supplied by Jail Chaplaincy Ministries, Inc. provide counseling and religious services to inmates, that is left up to Jail Chaplaincy Ministries, Inc. and the individual chaplains." The record indicates that Kellar delegated the drafting of the Ministries' Operational Procedures and Guidelines for Assistant Chaplains to the captain assigned to the Jail, working in conjunction with the various chaplains. Kellar admitted that he approved the manual and that the Sheriff's Department maintains the manuals and guidelines for the Ministries, having done so for all times relevant to this lawsuit:

Q. Okay. Do you recall the formulation of the—or the compilation of the Ministry Operational Procedures manual?

A. I can vaguely recall having it put together. I don't recall specific pro-

cedures, but yeah—yeah, generally I can recall that.

Q. What time frame do you recall that occurring?

A. I think that began in, again, the early eighties and was upgraded periodically through the mid-nineties. I think by the mid-nineties, '96, '97, we essentially had come to a point that our basic procedures were—were valid and so that then changes became less and less. It's an evolutionary process.

Moreover, it is uncontested that the Sheriff's Department determined the entity with which it would contract to provide religious services to inmates, the persons who would be allowed access to inmates, the areas of the Jail where access would be allowed, and the times and circumstances under which access would be permitted.

In her affidavit, Archer swears that the Ministries' procedures require that: "[M]ale inmates are to be ministered to by male chaplains, only, and that, likewise, female inmates are to be ministered to exclusively by female chaplains." The guidelines specifically state: "Without exceptions, male volunteers will minister to male inmates and female to female. There will be no male to female or female to male ministry."[8] Weir admitted at his deposition that although the policy prevented him from ministering to female inmates, he was excused from compliance with the policy as a matter of "courtesy." Weir further explained that staff chaplains were occasionally allowed to minister to inmates of the opposite sex, but only in certain limited circumstances:

---

**8.** Although the County argues that this policy applied only to "volunteers" and not "chaplains," Archer's affidavit contradicts this position. Moreover, the policy itself states,

"There will be no male to female or female to male ministry." Further, Weir admitted at deposition that the policy applied to him.

Q. Were there any other chaplains that had access to female inmates other than yourself?

A. The staff chaplains had access to female inmates. In the circumstances if they were on call and that they had to respond to a death in the family or something along that line, that whatever staff chaplain was on call could, in fact, be in contact with a female inmate, yes, sir, that's right. And by the same token, when the female staff chaplain is on call, she would be in contact with the male inmates.

\* \* \* \* \* \*

Q. Would a staff chaplain have any other access to an inmate of the opposite sex other than to notify them of a death in the family?

A. According to the manual, no, sir.

Q. How about what really would transpire on a day-to-day basis? Would there be other contacts or access?

A. In most cases, I'd instructed the staff chaplains that if they had to have some kind of contact with the opposite sex, for that to go through me because I was dumb enough to see I was above reproach.

Kellar conceded at deposition that, notwithstanding the provisions of the manual, Weir was allowed unrestricted access to female prisoners:

Q. Do you recall there—Prior to 1998 do you recall there ever being any restrictions placed on Chaplain Weir's contact with female inmates?

A. No.

Kellar further admitted that he exercised administrative oversight of the Ministries during all times relevant to this lawsuit. After Paz's report of Weir's alleged improprieties to Jail authorities, Kellar restricted Weir from movement within the Jail's female floors. Kellar specifically instructed Weir in 1998 "not to go on the female areas of the jail—into the female areas of the jail and if possible to restrict his movement to 701 San Jacinto." According to Weir, Archer, and the manual, Weir's prior access to these areas of the jail was against policy. According to Lampson's report, Weir assured Internal Affairs during the 1991 Rocha investigation that "in the future he would have female workers pull the female inmates," but this apparently did not occur.

Kellar further testified that he was aware of allegations against Weir as early as the 1980s. Aside from Paz, it has been disclosed that at least four other inmates engaged in sexual activity with Weir, although only the incidents involving Bernard, Rocha, and Rochford were reported contemporaneously to the Department. The evidence reflects that Kellar authorized the Ministries' Procedures and Guidelines, was aware that Weir had previously been accused of sexual contact with inmates, and chose not to enforce the gender-specific ministry policy until after Paz voiced her complaints about Weir to Harris County authorities. At the very least, Kellar was aware of the custom or "courtesy" of allowing Weir to travel throughout the Jail in performance of his ministerial duties, which gave him unrestricted access to female inmates in violation of the Ministries' procedures and guidelines. Thus, construing the evidence in the light most favorable to Paz, it could be inferred that there existed a custom in the Jail of permitting Weir unlimited access to female inmates, despite a formal policy to the contrary, which he, in turn, subverted for his own sexual gratification.

Additional evidence suggests the existence of a possible cover-up regarding Bernard's allegations against Weir. Bernard has repeatedly stated under oath that, after reporting her allegations to the Sher-

iff's Department, she took a polygraph examination, which she reportedly passed. It is undisputed that Sampson, whom Bernard reported as having sex with Weir, was given a polygraph, which indicated her denials of sexual activity to be truthful. The Sheriff's Department stated that it never contacted Bernard to follow up on her accusations because she was released from the Jail and the forwarding address she provided the Department was a vacant lot. In contrast, Bernard stated that she provided her parents' address for future contact, an address which had long been on file with the Sheriff's Department. Looking at this evidence in the light most favorable to the plaintiff, it could be inferred that Bernard's polygraph examination, which was harmful to Weir, was intentionally destroyed or misplaced by the County, while Sampson's polygraph, which was helpful to Weir, was retained, resulting in the case against Weir being dismissed as unfounded. Further, although Rocha and Rochford both denied having sexual contact with Weir, evidence regarding whether a polygraph examination was administered to Rochford is absent. Apparently, no polygraph examination was given to Rocha during the 1991 investigation.

The culpability element in a § 1983 action, which "requires evidence that the 'municipal action was taken with a "deliberate indifference" as to its known or obvious consequences,'" may "overlap with the proof of a policy." *Brown,* 219 F.3d at 457 (quoting *Bryan County,* 520 U.S. at 407, 117 S.Ct. 1382). The Supreme Court stated in *Farmer:*

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substan-

tial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837. Plaintiffs "must first prove a direct causal link between the [governmental] policy and the constitutional deprivation; they then must establish that the County consciously enacted a policy reflecting 'deliberate indifference' to the constitutional rights of its citizens." *Snyder,* 142 F.3d at 795–96 (citing *City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197); *see Hare,* 74 F.3d at 649 n. 4. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan County,* 520 U.S. at 410, 117 S.Ct. 1382.

In this case, a genuine issue of material fact exists as to whether the County and Kellar, specifically, displayed deliberate indifference to reports of Weir's sexual activities with female inmates and the potential for future abuses. There is sufficient evidence from which it could be inferred that Kellar chose not to enforce applicable policies against Weir and that he disregarded an excessive risk of harm to female detainees when he failed to curtail Weir's access to female inmates. A fact issue also arises on the issue of causation, *i.e.,* whether the County's alleged deliberate indifference to Weir's purported sexual activities was the "moving force" behind his reported sexual contacts with Paz. *See Piotrowski,* 237 F.3d at 578. Taking the evidence in the light most favorable to Paz, the record suggests that Weir, a potential "ticking time bomb" of sexual improprieties, was allowed unfettered access to female inmates and was insulated from any in-depth inquiries of his purported misdeeds, giving him reason to assume that no adverse consequences would arise from his actions. This arguably permitted Weir to engage in such alleged behavior with impunity— trading sexual favors from some of society's most vulnerable women for personal

gifts, contributions to inmate accounts, and special privileges.

### (2). *Retaliation*

█ Paz has also presented sufficient evidence to raise an issue of material fact with regard to her retaliation claim. Paz contends that, at Archer's request, Moore placed and kept her in administrative separation after she was acquitted of the disciplinary charge. Because it is undisputed that Moore was delegated authority by the Sheriff to assign prisoners at the Jail to administrative separation, in this situation, Moore was the relevant policymaker. His decision to place and continue Paz in administrative separation could be viewed as "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations.'" *Bryan County,* 520 U.S. at 410, 117 S.Ct. 1382 (quoting *Pembaur,* 475 U.S. at 485, 106 S.Ct. 1292). Construing the evidence in the light most favorable to Paz, it could be inferred that Moore's action of placing and then retaining Paz in administrative separation after she was found not guilty of the disciplinary charge displayed deliberate indifference to her First Amendment right to speak out about a matter of public concern—a jail chaplain's sexual contacts with female inmates of the county jail.

### C. *42 U.S.C. § 1985(3)*

Paz also alleges that Weir and the County unlawfully conspired to violate her civil rights in violation of 42 U.S.C. § 1985. Paz stated in her initial response to the County's motion that additional discovery was necessary to support this claim, pointing out that Weir's deposition had been delayed pursuant to court order. A transcript of Weir's deposition, however, fails to provide further support for the claim,

and Paz does not address this cause of action in her supplemental responses to the County's summary judgment motion.

█ A person injured as the result of a conspiracy to interfere with her civil rights may bring an action under 42 U.S.C. § 1985. Subsection 1 of the statute relates to a conspiracy to prevent a public official from performing his duty; Subsection 2 addresses a conspiracy to obstruct justice or to intimidate a party, a witness, or a juror; and Subsection 3 concerns the acts of two or more persons conspiring to deprive any person of certain civil rights. *See Holdiness v. Stroud,* 808 F.2d 417, 424 (5th Cir.1987). Specifically, § 1985(1) provides "any person" the right to be free from a conspiracy "to prevent, by force, intimidation or threat" his acceptance of a federal office or his discharge of its duties. 42 U.S.C. § 1985(1). Section 1985(2) gives "any party or witness in any court of the United States" the right to be free from a conspiracy to deter, intimidate, or threaten him for attending or testifying. 42 U.S.C. § 1985(2); *see also Deubert v. Gulf Fed. Sav. Bank,* 820 F.2d 754, 758 (5th Cir. 1987); *Disney v. Horton,* No. Civ. A. 2:99–CV–0138, 2000 WL 490848, at *4 (N.D.Miss. Apr. 14, 2000). Section 1985(3) provides a remedy to "any person or class of persons" harmed when "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

█ Although Paz does not specify the subsection upon which she relies, she appears to be attempting to invoke Subsection 3.[9] Section 1985(3) provides, in pertinent part:

---

**9.** 42 U.S.C. § 1985(1) does not apply because Paz was not ever offered a federal office. Section 1985(2) is inapplicable because at the time of the incidents in question, Paz was not a party or witness in a "court of the United States" for an issue related to Weir's actions.

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Id.* Section 1985(3) creates no rights, but "is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—the equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

▪ To recover under § 1985(3), the plaintiff must allege and prove four elements: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Hilliard v. Ferguson,* 30 F.3d 649, 652–53 (5th Cir.1994); *Deubert,* 820 F.2d at 757. In addition, the conspiracy must be motivated by " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " *Scott,* 463 U.S. at 829, 103 S.Ct. 3352 (quoting *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790); *see Hilliard,* 30 F.3d at 653 (citing *Burns–Toole v. Byrne,* 11 F.3d 1270, 1276 (5th Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2680, 129 L.Ed.2d 814 (1994)); *Mississippi Women's Med. Clinic v. McMillan,* 866 F.2d 788, 793 (5th Cir.1989).

▪ The Supreme Court has suggested that actionable § 1985(3) claims may be limited to race-based conspiracies. *See McLean v. International Harvester Co.,* 817 F.2d 1214, 1218 (5th Cir.1987) (citing *Scott,* 463 U.S. at 836, 103 S.Ct. 3352). "[I]t is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause." *Scott,* 463 U.S. at 836, 103 S.Ct. 3352. It is now apparent that the Fifth Circuit requires a § 1985(3) claim to be based on "an allegation of race-based conspiracy." *Bryan v. City of Madison,* 213 F.3d 267, 276 (5th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001) (citing *Newberry v. East Tex. State Univ.,* 161 F.3d 276, 281 n. 2 (5th Cir. 1998)).

In the case at bar, Paz has failed to allege or adduce any evidence of an unlawful conspiracy involving Harris County. There is no evidence that Paz was ever an applicant for, or a holder of, a federal office, or that she was ever threatened or intimidated to deter her from attending or testifying in a court proceeding. *See Deubert,* 820 F.2d at 758. Furthermore, she has presented no facts suggesting a conspiracy "aim[ed] at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790; *see Roe v. Abortion Abolition*

*Soc'y,* 811 F.2d 931, 933–34 (5th Cir.), *cert. denied,* 484 U.S. 848, 108 S.Ct. 145, 98 L.Ed.2d 101 (1987). There is no indication that she was a victim of racial or political animus. In fact, viewing the evidence in the light most favorable to Paz, without weighing the evidence, assessing its probative value, or resolving any factual disputes, it is apparent that she has demonstrated no viable claim against Harris County under § 1985. *See Bryan,* 213 F.3d at 276. Thus, judgment as a matter of law in favor of Harris County is warranted on this claim.

### D. *42 U.S.C. § 1986*

 Section 1986 provides a cause of action against anyone who "having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." 42 U.S.C. § 1986; *see Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993). A cognizable claim under 42 U.S.C. § 1986 is predicated upon a valid claim under § 1985. *See id.; Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405 (1978); *Mitchell v. United Parcel Serv.,* 21 F.Supp.2d 627, 630 (N.D.Miss.1998). Hence, "[i]n the absence of a claim under section 1985, [Paz] obviously cannot sustain a claim under section 1986." *See Galloway v. Louisiana,* 817 F.2d 1154, 1159 n. 2 (5th Cir.1987); *see also Bradt v. Smith,* 634 F.2d 796, 799 n. 3 (5th Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106 (1981); *Mitchell,* 21 F.Supp.2d at 630. Section 1986 merely enforces § 1985 by imposing liability upon any person who has knowledge of any of the wrongs conspired to be done and mentioned in § 1985. *See Moor v. Alameda County,* 411 U.S. 693, 709–10 n. 26, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *see also Todd v. Hawk,* 72 F.3d 443, 444 n. 2 (5th Cir.1995); *McMillan,* 866 F.2d at 795 n. 7.

Thus, because Paz's § 1985 claim fails, her § 1986 claim must be rejected, as well.

### E. *Sexual Battery*

 Paz's complaint can also be construed as raising a state law claim for sexual battery. In Texas, a governmental entity has sovereign immunity and cannot be held liable for the actions of its agents or employees unless there is a constitutional or statutory provision waiving such immunity. *See Texas Dep't of Transp. v. Able,* 35 S.W.3d 608, 611 (Tex.2000); *Kerrville State Hosp. v. Fernandez,* 28 S.W.3d 1, 3 (Tex.2000); *Kinnear v. Texas Comm'n on Human Rights,* 14 S.W.3d 299, 300 (Tex.2000); *City of Amarillo v. Martin,* 971 S.W.2d 426, 427 (Tex.1998); *Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 341 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); *Harris County v. Dillard,* 883 S.W.2d 166, 168 (Tex.1994); *University of Tex. Med. Branch v. York,* 871 S.W.2d 175, 177 (Tex.1994). Sovereign immunity can be waived only through the use of clear and unambiguous language. *See Fernandez,* 28 S.W.3d at 3; *York,* 871 S.W.2d at 177; *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980). In the absence of a waiver, the County is entitled to invoke sovereign immunity with respect to Paz's claim. *See Able,* 35 S.W.3d at 611; *York,* 871 S.W.2d at 177; *City of El Paso v. W.E.B. Invs.,* 950 S.W.2d 166, 169 (Tex. App.—El Paso 1997, writ denied); *Allen v. City of Midlothian,* 927 S.W.2d 316, 322 (Tex.App.—Waco 1996, no writ).

The Texas Legislature enacted the Texas Tort Claims Act ("TTCA") to waive sovereign immunity in certain limited circumstances. *See Bossley,* 968 S.W.2d at 340, 343; *Kerrville State Hosp. v. Clark,* 923 S.W.2d 582, 586 (Tex.1996); *York,* 871 S.W.2d at 177. The TTCA provides:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by the condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2000). Counties, as political subdivisions of the State of Texas, fall within the parameters of the Act. *See id.* at § 101.001(3)(B); *see also McCord v. Memorial Med. Ctr. Hosp.*, 750 S.W.2d 362, 363 (Tex.App.—Corpus Christi 1988, no writ).

■ The TTCA waives immunity, however, for only three types of claims: (1) claims arising from the operation or use of motor-driven vehicles or equipment; (2) claims caused by a condition or use of tangible personal or real property; and (3) claims arising from premises defects. *See id.* at §§ 101.021, 101.022; *Kesler v. King*, 29 F.Supp.2d 356, 375 (S.D.Tex.1998); *see also Bossley*, 968 S.W.2d at 342–43; *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 33 (Tex.1983); *Texas Dep't of Health v. Doe*, 994 S.W.2d 890, 893 (Tex.App.—Austin 1999, no pet.); *Lamar Univ. v. Doe*, 971 S.W.2d 191, 195 (Tex.App.—Beaumont 1998, no pet.); *Vincent v. West Tex. State*

*Univ.*, 895 S.W.2d 469, 472 (Tex.App.—Amarillo 1995, no writ). To hold a governmental entity liable under the TTCA for the acts of its agents or employees: (1) the claim must arise under one of three specific areas of liability; and (2) the claim must not fall within an exception to the waiver of sovereign immunity. *See Alvarado v. City of Brownsville*, 865 S.W.2d 148, 155 (Tex.App.—Corpus Christi 1993), *rev'd on other grounds*, 897 S.W.2d 750 (Tex.1995); *accord City of Hempstead v. Kmiec*, 902 S.W.2d 118, 122 (Tex.App.—Houston [1st Dist.] 1995, no writ); *McKinney v. City of Gainesville*, 814 S.W.2d 862, 865 (Tex. App.—Fort Worth 1991, no writ); *see also City of Denton v. Page*, 701 S.W.2d 831, 834 (Tex.1986); *Salcedo*, 659 S.W.2d at 31. "The determination of a governmental entity's negligence will be made only after a claimant has cleared these two statutory hurdles." *Alvarado*, 865 S.W.2d at 155.

■ The TTCA does not, however, waive immunity for intentional torts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 (West 2000); *Taylor v. Gregg*, 36 F.3d 453, 457 (5th Cir.1994); *Dupre v. Harris County Hosp. Dist.*, 8 F.Supp.2d 908, 928 (S.D.Tex.1998); *Riggs v. City of Pearland*, 177 F.R.D. 395, 405 (S.D.Tex.1997). In fact, "the Tort Claims Act's waiver of immunity expressly excludes intentional torts such as assault and battery and intentional infliction of emotional distress." *Kesler*, 29 F.Supp.2d at 375 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.057(2) (West 2000)); *see Kellough v. Bertrand*, 22 F.Supp.2d 602, 612 (S.D.Tex.1998); *Dupre*, 8 F.Supp.2d at 928. The statute provides:

■ This chapter does not apply to a claim:

(1) based on an injury or death connected with any act or omission arising

out of civil disobedience, riot, insurrection, or rebellion; or

(2) arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities.

Tex. Civ. Prac. & Rem. Code Ann. § 101.057 (West 2000). Hence, claims arising out of assault, battery, false imprisonment, or any other intentional tort are not actionable under the TTCA. *See Holland v. City of Houston,* 41 F.Supp.2d 678, 714 (S.D.Tex.1999); *Drain v. Galveston County,* 979 F.Supp. 1101, 1102, 1104 (S.D.Tex. 1997); *Wicker v. City of Galveston,* 944 F.Supp. 553, 558–59 (S.D.Tex.1996); *see also Kellough,* 22 F.Supp.2d at 612; *Riggs,* 177 F.R.D. at 405; *Callis v. Sellars,* 953 F.Supp. 793, 801 (S.D.Tex.1996); *City of San Antonio v. Dunn,* 796 S.W.2d 258, 261 (Tex.App.—San Antonio 1990, writ denied); *McCord,* 750 S.W.2d at 363. "This provision shields municipalities from suits arising out of intentional torts committed by governmental employees and should be liberally construed to accomplish this objective." *Gillum v. City of Kerrville,* 3 F.3d 117, 123 (5th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994) (citations omitted). Therefore, to the extent that Paz raises a state law claim for sexual battery, the County is absolved from liability under the doctrine of sovereign immunity.

III. *Conclusion*

In summary, genuine issues of material fact exist regarding Paz's § 1983 claims against the County arising out of alleged constitutional invasions of her right to bodily integrity and retaliation for the exercise of her right to free speech. Therefore, Paz's § 1983 claims may proceed to trial. No genuine issues of material fact exist, however, with regard to Paz's § 1985 and § 1986 claims or her state law claim for sexual battery, rendering summary judgment appropriate as to those claims.